UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DANIEL DONG MIN KIM,                                    Civil Action No.:

                                    Plaintiff,

                    - against –

                                                        **COMPLAINT & JURY DEMAND**
YOUNGWUN MOON a/k/a  BRYAN YOUNGWUN
MOON,

                                    Defendant.
-------------------------------------------------------------------X


        Plaintiff, Daniel Dong Min Kim ("Plaintiff"), for his complaint against defendant

YOUNGWUN MOON a/k/a BRYAN YOUNGWUN MOON, ("Defendant"), by and through his

attorney, Christopher R. Lynn, Esq., respectfully allege and show to this Court:

### <u>NATURE OF THE ACTION</u>

        1.      Plaintiff brings this action, *inter alia*, for damages arising out of Defendant's

publication and republication of false and defamatory statements about Plaintiff, and for

Defendant's related conduct designed to incite Korean-American media in New York and New

Jersey against Plaintiff, where Plaintiff practices law.

        2.      Defendant ignored and disregarded Plaintiff's demand that he remove his

attorney's letter, which was addressed to Korean American Association of Greater New York

("KAAGNY"), a non-profit organization representing approximately 800,000 members in the tri-

state area, which Defendant had uploaded to the Kakaotalk (social media chat rooms) for all

executives and officers to see.

        3.      Defendant maliciously attacked Plaintiff in order to hamper Plaintiff's ability to

function as a counsel to KAAGNY and to destroy Plaintiff's professional reputation. Plaintiff

seeks damages and such further relief as this Court deems just and proper so that Plaintiff can continue to represent KAAGNY on a voluntary and pro bono basis without unlawful interference by Defendant.

## THE PARTIES

4.    At all times hereinafter mentioned, Plaintiff is a licensed attorney admitted in the States of New York and New Jersey, is a citizen and domiciliary of the State of New Jersey, and has served as advisory counsel to KAAGNY since or about May 2025.

5.    Upon information and belief, Defendant is a citizen and domiciliary of the State of New York, residing at 2 Bay Club Dr. Apt. 1V, Bayside, County of Queens, New York 11360, and has acted as Vice-Chairperson of KAAGNY's Board of Directors until December 23, 2025, when a vote of the KAAGNY Board failed to ratify him as Chairperson, as more fully set forth below.

## JURISDICTION AND VENUE

6.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen and domiciliary of the State of New Jersey. Defendant is a citizen and domiciliary of the State of New York.

7.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District. The defamatory statements at issue were intentionally directed to, disseminated within, and foreseeably caused injury in the Southern District of New York; KAAGNY, whose governance, building issues, and internal disputes form a central subject of

Defendant's accusations, is headquartered in Manhattan within this District; Plaintiff conducts significant portions of his professional legal practice and maintains substantial professional reputation in this District; and Defendant's publications foreseeably and primarily caused reputational harm to Plaintiff within this District. Accordingly, the Southern District of New York constitutes a principal locus of both the underlying events and the resulting injury.

## FACTUAL STATEMENT RELEVANT TO ALL COUNTS

### a. Background: KAAGNY Building and Long-Running Third-Floor Litigation

8.    KAAGNY owns the building located at 149 West 24th Street, New York, New York 10011 (the "Building").

9.    For more than twenty years, there has been litigation and dispute involving the third-floor tenant, including a 2019 action in this Court titled *Korean American Association of Greater New York, Inc. v. Thierry Alet*, Index No. 160104/2019, concerning abandonment and use and occupancy for a portion of the third floor.

10.    Thus, as of 2025, there was ongoing, real litigation regarding the third-floor space, with a private counsel of record and a documented procedural history.

### b. Fifth-Floor Tenant Dispute and the Absence of Any Lawsuit

11.    Separately, KAAGNY has faced a rent overcharge / Loft Law dispute with the fifth-floor tenant of Apartment 5B, who has asserted that she is rent-regulated and has withheld rent in escrow while considering filing with the Loft Board and/or other agencies.

12.    In a June 19, 2025 email, the fifth-floor tenant's representative wrote to KAAGNY explaining that, based on DHCR guidelines, she believed she had been overcharged and was ready to file an action against KAAGNY for compensatory damages and punitive damages.

13.     As of December 2025, there was no filed lawsuit by the fifth-floor tenant; the dispute was at the stage of negotiations between the  parties, Tenant and the president of KAAGNY, based on the tenant's counsel and Plaintiff's advisement for efficiency.

**c. September 30, 2025 Board Presentation – Moon Learns the True Facts**

14.     On September 30, 2025, at KAAGNY's second board meeting of the term, Plaintiff gave a detailed presentation to the board, including Defendant and other executives, explaining:

i. the status of the third-floor litigation against the Alet tenant;

ii. the nature of the fifth-floor Apartment 5B dispute, including the escrow, overcharge claim, and possible Loft Board filing, and the fact that no lawsuit had yet been filed but the parties' ongoing good faith negotiations to amicably adjust the dispute;

iii. the sixth-floor tax-exempt status and NFP property-tax exemption process, referencing KAAGNY's NFP exemption application being handled by another private counsel specialized in tax exemption law; and

iv. Certificate of Occupancy and zoning / use issues concerning the Building, including the uses listed for each floor.

15.     Thus, by late September 2025, Defendant had been fully and accurately briefed that: there was a real, pending lawsuit involving the third floor, and there was no lawsuit yet involving the fifth-floor tenant, only ongoing settlement negotiation between the parties.

**d. December 23, 2025 Board Meeting – Moon is Correctly Told Again: No 5th-Floor Lawsuit**

16.     On or about December 23, 2025, during an executive KAAGNY meeting, opened to all media, Defendant asked Plaintiff whether there was a lawsuit pending concerning the fifth-

floor tenant.

17.    Plaintiff explicitly informed Defendant that there was no lawsuit yet regarding the fifth-floor tenant, that the negotiation was ongoing between the parties, and that the only pending case was the previously described third-floor action.

18.    Thus, KAAGNY has been paying legal fees to two different law firms for the Third-floor disputes and tax exemption status for 6th floor.

19.    Although KAAGNY suggested that Plaintiff submit an invoice, Plaintiff has never issued an Invoice because he has been working on a pro bono basis.

20.    On December 23, 2025, due to the Chairman of the Board's resignation, Defendant and the president of KAAGNY argued over whether Defendant who was Vice-Chairperson of the Board is the Chairman by succession under the bylaws of KAAGNY.

21.    The President argued that since no ratification by majority vote during the first and second executive meeting, Defendant was required to be ratified.

22.    Defendant argued that he was the legitimate successor under the bylaws of KAAGNY and no ratification was required.

23.    The executives took the voting for Defendant's ratification as a Chairman: 16 casted rejection of Defendant as Chairman, 1 approval and 1 abstention was the final vote.

24.    The executives voted a new Chairwoman.

**e. December 26, 2025 – Moon Publishes the Defamatory "Fundraising / Fake Lawsuit"**

25.    A day after Christmas, on December 26, 2025, Defendant authored and circulated a written statement (in Korean and English) to Korean-American media TV stations, radio stations, and Newspapers as follows:

"**I am informing you that I have filed a complaint against attorney Kim** [Daniel] **Dong-min with the New York and New Jersey Bar Associations for the following reasons:**

**1. Despite knowing that the tenant on the 5th floor of the Korean Association building had not filed a lawsuit, he produced and disseminated false information to the Korean community, claiming that a lawsuit had been filed, in an attempt to solicit donations from Korean community members.**

**2. As an advisory attorney for the New York Korean Association, he was supposed to assist in the smooth operation of the board of directors, but instead, he actively disrupted the board meetings, claiming to be a board member himself, ultimately causing the meetings to fail.**

**3. Despite being obligated to provide legal assistance to the Korean Association and its board of directors, he distorted the articles of association and spearheaded efforts to undermine the legitimate chairman, acting as President Lee Myung-seok's personal lawyer. This is a clear conflict of interest.**

**4. He spearheaded the illegal creation of a fake board of directors.**

**5. He ignored, condoned, and assisted in President Lee Myung-seok's illegal activities, causing harm to the Korean Association and putting it at risk."**

26.     In the very first paragraph of the Defamation Notice, Defendant falsely alleged, in substance, that:

● the fifth-floor tenant lied about an action having been filed, and

● this supposed "lawsuit story" was being used to raise funds from the Korean community, implying that Plaintiff produced or used false litigation information to solicit donations and obtain legal fees.

27.     By accusing Plaintiff of faking or exaggerating the existence of a fifth-floor lawsuit for the purpose of fundraising and obtaining money, Defendant directly imputed to Plaintiff criminal and fraudulent conduct and serious professional misconduct as an attorney.

28.     Defendant made these allegations knowing they were false, because only three

days earlier, on December 23, Plaintiff had expressly told him and all executives that no lawsuit

had yet been filed by the fifth-floor tenant.

29.    In subsequent paragraphs of the same Defamation Notice, Defendant further

accused Plaintiff, in substance, of:

      a. **leading an "illegal fake board"**;

      b. **distorting the bylaws** to neutralize the "lawful chairperson";

      c. **acting as a ringleader** to disrupt and derail the board;

      d. **engaging in "illegal" acts** that harmed KAAGNY; and

      e. being at the center of a conflict of interest and ethical breach.

30.    Defendant also claimed that he reported Plaintiff to  New York and New Jersey

disciplinary authorities, thereby further attacking Plaintiff's professional reputation and fitness as

a lawyer.

31.    Defendant's statements were false. Plaintiff never lied about the status of any

lawsuit, never fabricated a lawsuit or asked funds for legal fees, never misled KAAGNY

regarding litigation, never created any "fake board," and never engaged in illegal or unethical

conduct.

32.    Defendant's references to alleged complaints filed with the New York and New

Jersey bar authorities served only as a pretext to create an illusion of legitimacy, while his true

objective was to damage Plaintiff's professional reputation through malicious and false

accusations.

**f. Defendant Weaponizes Counsel Letter and Launches Coordinated Media Attack**

33.    Later on December 26, 2025, immediately after publishing the defamatory

accusations described above, Defendant caused his counsel, Ray Beckerman, Esq., to fax a letter to Plaintiff personally — not to KAAGNY, not to the Board, and not to KAAGNY's formal legal representative — concerning Defendant's unilateral contention that the December 23, 2025 executive meeting was "null and void" and that Defendant remained the lawful Chair of the Board.

34.    The letter contained nothing adjudicative; it merely repeated Defendant's own positions and allegations and constituted advocacy correspondence, not a ruling, determination, injunction, or directive. Nonetheless, Defendant immediately began using the letter as a propaganda tool, as if it carried judicial authority. A true and correct copy of the December 26, 2025 attorney letter is attached as Exhibit "A."

35.    Had Plaintiff not checked the office fax on the day after Christmas, Plaintiff would have missed the fax. Defendant's timing reflects the calculated nature of his communications campaign and urgency to weaponize the letter in furtherance of his narrative.

36.    Immediately thereafter, Defendant republished his attorney's letter into KAAGNY's internal Executive KakaoTalk Group Chat and into the Officers KakaoTalk Group Chat, representing and presenting the attorney's advocacy letter to KAAGNY leadership as if it were an authoritative and binding legal determination, and as if counsel's letter conclusively established that:

i. the December 23, 2025 executive meeting was "null and void";

ii. the election of a new Chairperson lacked legal effect; and

iii. Defendant continued as the lawful Chair of KAAGNY.

37.    Defendant used the letter to create and promote the false impression that

Plaintiff had failed to respond to Defendant's allegations because Plaintiff was himself the subject of legitimate legal and ethical attack, and therefore could not defend himself. Defendant's dissemination of the attorney letter was calculated to suggest that Plaintiff's supposed "silence" constituted an admission of wrongdoing or acknowledgment of guilt.

38.     Defendant's intentional publication of his attorney's letter to these executive forums constituted a deliberate effort to legitimize his defamatory narrative, discredit Plaintiff, and frame Plaintiff as complicit in alleged wrongdoing and illegitimacy within KAAGNY governance.

39.     Upon learning that Defendant had published the attorney's letter in the KakaoTalk chatrooms, Plaintiff demanded that Defendant remove the letter and cease misrepresenting its content as possessing adjudicative or binding effect. Defendant refused to remove the publication.

40.     Defendant's refusal demonstrates continued malicious intent and constitutes a further republication of false and misleading assertions calculated to harm Plaintiff's professional reputation.

41.     Defendant caused Korea Daily News to publish an article on December 29, 2025 stating that Attorney Ray Beckerman, acting on behalf of Defendant as Acting Chair, had sent a letter to Plaintiff, identified in the article as KAAGNY's advisory counsel and director.

42.     By orchestrating this publication, Defendant falsely portrayed Plaintiff as the official legal channel for KAAGNY governance, thereby falsely suggesting that Plaintiff's receipt of the letter validated Defendant's claims and strengthened the purported legal legitimacy of Defendant's attack on the December 23, 2025 meeting and on Plaintiff's conduct.

**g. December 29, 2025 – Defendant Escalates to a Public Press Conference and Mass Publication**

43.     On December 29, 2025, Defendant convened and held a press conference at the very restaurant where the December 23, 2025 meeting had taken place, further escalating his public campaign.

44.     At this press conference, Defendant reiterated his defamatory themes, publicly proclaiming that the December 23 meeting and election were "null and void," attacking Plaintiff's professional integrity, and implying that Plaintiff's legal role was improper and he led the "fake" directors/executives.

45.     The subheading of Korea Times dated December 30, 2025 states:

"…김동민 고문 변호사와 가짜 이사들도 사법적 책임물을것" which translates as **"Attorney and Legal Advisor Kim Dong-min, along with the 'fake directors,' will also be held legally responsible."**

46.     Significantly, the article ends with the following defamatory statement:

문 부이사장은 "벤 차량 구입 및 유지 비용과 관련해 불법으로 지출된 한인회 공금 전액을 즉각 변제해야 하며, 가짜 이사회 구성을 주도한 김동민 고문 변호사와 가짜 이사들에 대한 사법적 책을뭉르 물을 것" 이라며 향후 법적 조치를 예고했다."

English Translation:

**"Vice Chair Moon stated, 'The full amount of KAAGNY funds that were illegally spent in connection with the purchase and maintenance costs of the van must be immediately repaid, and legal responsibility will also be pursued against Legal Advisor Attorney Kim Dong-min, who led the formation of the**

**'fake board,' as well as the fake directors,' announcing forthcoming legal action."**

47.    Defendant purposefully and maliciously linked Plaintiff to the alleged unlawful conduct of the KAAGNY President, with the intent to create a false association of guilt and to inflict reputational harm upon Plaintiff.

48.    As Defendant intended and foresaw, his statements were widely disseminated in the Korean-American media. The two largest Korean-language media outlets in the New York tristate region—Korea Times (한국일보) and Korea Daily / Korea Central News (중앙일보)—reported on Defendant's narrative on or about December 29–30, 2025, further spreading Defendant's defamatory accusations to a community of approximately 800,000 Korean-Americans in the region.

49.    These publications repeated, amplified, and validated Defendant's false assertions, including insinuations that Plaintiff misled the community, engaged in unethical activity, and participated in so-called "fake board" actions.

50.    Defendant's actions demonstrate a coordinated and intentional scheme, beginning with his December 26 Defamation Notice, followed by his counsel's letter, followed by internal propaganda distribution in executive chat groups, and culminating in a public press conference designed to ensure maximum reputational damage.

51.    Defendant acted with actual malice, deliberate falsity, reckless disregard for the truth, and knowing awareness that Plaintiff had worked pro bono, had accurately reported litigation status, and had corrected Defendant regarding the fifth-floor tenant issue only days before.

52.     Defendant also acted with common-law malice, motivated by spite and ill will, and with the specific intent to destroy Plaintiff's professional reputation and standing in the KAAGNY community and within the Korean-American legal and business communities.

53.     Defendant's scheme was calculated to falsely associate Plaintiff with alleged misconduct attributed to President Lee, to portray Plaintiff as dishonest, unethical, fraudulent, and professionally unfit, and to destroy Plaintiff's standing and credibility in the KAAGNY community and legal profession.

54.     As a direct and proximate result of Defendant's deliberate escalation, republication, refusal to retract, and press amplification, Plaintiff has suffered substantial reputational harm, humiliation, emotional distress, injury to his standing in the Korean-American community, and professional damage.

## AS AND FOR A FIRST CAUSE OF ACTION – DEFAMATION

55.     Plaintiff Daniel D. Kim incorporates and realleges paragraphs 1 through 54 above as if fully set forth herein.

56.     On or about December 26, 2025, Defendant published and caused to be published numerous false and defamatory statements about Plaintiff by issuing a written public statement in Korean and English accusing Plaintiff of lying about litigation, fabricating a lawsuit for fundraising purposes, participating in an "illegal fake board," engaging in unethical conflicts of interest, and aiding "illegal conduct" of KAAGNY's President, and further claiming that Plaintiff had been reported to attorney disciplinary authorities. These statements were widely disseminated to Korean-American television networks, radio stations, and newspapers.

57.     The defamatory statements included, among others, the following assertions:

- that Plaintiff knew the fifth-floor tenant had not filed a lawsuit, yet "produced and disseminated false information" claiming a lawsuit existed in order to "solicit donations" from the Korean-American community;

- that Plaintiff disrupted KAAGNY board functions and "sabotaged" meetings;

- that Plaintiff distorted bylaws, undermined a "legitimate Chairperson," and engaged in "clear conflicts of interest";

- that Plaintiff "led the creation of an illegal fake board";

- that Plaintiff ignored, condoned, and assisted alleged "illegal activities," placing KAAGNY at risk; and

- that Defendant had reported Plaintiff to New York and New Jersey bar authorities.

58.    True and correct copies of Defendant's defamatory statements and resulting publications are annexed as Exhibit "B."

59.    The statements were false when made. Plaintiff never fabricated a lawsuit, never misled the community, never solicited donations through falsehoods, never engaged in illegal conduct, never created or led a "fake board," never acted in unethical conflict, and was acting pro bono at all relevant times.

60.    Defendant was expressly informed on September 30, 2025 and again on December 23, 2025 that no lawsuit had yet been filed by the fifth-floor tenant; nevertheless he announced the opposite on December 26, 2025.

61.    The statements were published to third parties, including major Korean-American media outlets, whose representatives read, heard, and knew of the allegations when they attended the news conference on December 29, 2025, and the accusations were

subsequently publicized by Korea Daily News on December 29, 2025 and by Korea Times on December 30, 2025.

62.    The statements concerned Plaintiff's professional integrity, reputation, and conduct as a licensed attorney, affecting matters of profound professional concern.

63.    Defendant published the statements with actual malice, knowing they were false or with reckless disregard for their falsity, because Defendant had been repeatedly informed of the truth and nevertheless chose to launch a coordinated media campaign, republish the statements internally and externally, refuse retraction, and escalate through a staged press conference to inflict maximum reputational damage. Defendant further acted with common-law malice, in bad faith and with intent to injure Plaintiff's reputation.

64.    The statements were defamatory because they subjected Plaintiff to hatred, distrust, ridicule, contempt, disgrace, and professional disrepute in the Korean-American communities, and among fellow attorneys, officers, donors, and existing clients and potential new clients.

65.    Furthermore, the statements constitute defamation per se because they allege that Plaintiff engaged in criminal and fraudulent misconduct, accuse Plaintiff of dishonesty and unethical conduct incompatible with the legal profession, and directly injure Plaintiff in his business, profession, and occupation as an attorney.

66.    Defendant further escalated his campaign to defame Plaintiff on December 26, 2025 by posting his attorney's letter, which had been sent to Plaintiff, in KAAGNY's directors' KakaoTalk chatroom and officers' KakaoTalk chatroom, thereby republishing and amplifying the defamatory narrative among KAAGNY leadership.

67. Defendant's further publications therefore created false and defamatory implications, including the implication that Plaintiff was guilty, compromised, and unable to respond because he was "under legitimate attack."

68. Reasonable third parties understood the statements to refer to Plaintiff, who was specifically named as "Attorney Daniel D. Kim, advisory counsel to KAAGNY," and identified as the recipient of Defendant's counsel's letter, thereby falsely creating the appearance of legal authority and legitimacy.

69. As a direct and proximate result of Defendant's defamation and repeated republication, Plaintiff has suffered severe damage to his personal and professional reputation, emotional distress, humiliation, loss of standing in the community, injury to his law practice, and other general and special damages in amounts to be proven at trial.

**WHEREFORE,** Plaintiff Daniel Dong Min Kim demands judgment against Defendant Youngwun Moon a/k/a Bryan Youngwun Moon for compensatory damages, special damages, and punitive damages in amounts to be determined by the jury at trial, together with the costs and disbursements of this action, pre- and post-judgment interest as allowed by law, and such other and further relief as the Court deems just and proper.

Christopher Lynn Esq.,
Attorney for Plaintiff
24-15 Queens Plaza North Unit 5D
Long Island City, New York City 11101
(917) 385-0368

January 2, 2025

# FAX COVER SHEET

| TO | |
|---|---|
| **COMPANY** | |
| **FAX NUMBER** | 16463491732 |
| **FROM** | Ray Beckerman |
| **DATE** | 2025-12-26 19:59:35 GMT |
| **RE** | December 23rd board meeting of Korean American Association |

of Greater  New York

**COVER MESSAGE**

Dear Daniel

Please see attached letter
regarding irregularity of the
December 23rd board meeting.

Best regards

Ray


*Ray Beckerman*
Law Office of Ray Beckerman PC
425 New York Avenue, Ste 109
Huntington NY 11743
(718) 544-3434 Fax (718) 559-6584
ray@beckermanlegal.com
http://beckermanlegal.com
https://businesslawyersnewyork.com/

# L<small>AW</small> O<small>FFICE OF</small> R<small>AY</small> B<small>ECKERMAN</small>, P.C.

*Attorneys at Law*
425 New York Avenue, Suite 109
Huntington NY 11743
Telephone (718) 544-3434
Email: ray@beckermanlegal.com
Web site: http://beckermanlegal.com

*Ray Beckerman*

December 26, 2025

By Fax 646-349-1732

Daniel D. Kim, Esq.
Daniel D. Kim, P.C.
5 Pennsylvania Plaza
23rd Floor
New York, New York 10001

Re: Korean American Association of Greater New York

Dear Daniel;

       I have been advised that you are general counsel to the Korean American Association of Greater New York ("KAAGNY").

       I am the attorney for Moon Young-wun ("Mr. Young"), the Chairman of KAAGNY. My client had been Vice Chairman for seven (7) months, and pursuant to the first sentence of the Bylaws Chapter 5, Article 5, Section 3, became Chairman upon the recent resignation of Chairman Kwak Ho-soo by operation of law. ("In the event of resignation, death, or inability to perform duties for any reason, the Vice-Chairman replaces the Chairperson for the remaining term.")

       He has asked me to convey to you that at the December 23rd meeting of the board of directors, Lee Myung-seok, the president, purported to seize the role of Chairman, to chair the meeting, and to circulate preprinted ballots for an election of a Chairman, which resulted in purporting to replace my client as Chairman with Esther Lee.

       As you know, the president has no authority to act as Chairman and the meeting, as well as the resulting election of Esther Lee, are null and void and of no effect. A copy of the applicable sections of KAAGNY's bylaws is annexed.

       Mr. Myung-seok excused his conduct by falsely claiming that Mr. Young was not lawfully serving as Vice Chairman due to his not having been elected by the full board. This is untrue, as Mr. Young had been appointed by the then Chairman Mr. Ho-soo to serve out the remaining term of a directorship that had become vacant due to resignation, pursuant to second sentence of the Bylaws Chapter 5, Article 5, Section 3. ("For all other executives except the Chairperson, the replacement for the remainder of the term shall be appointed by the Chairperson.")

       Please confirm to all actual board members, to the president, and to Ms. Lee, that the "election" conducted at the December 23rd board meeting is null and void *ab initio* under the Association's bylaws, that Mr. Young continues to be the lawfully appointed Chairman, and that the president has no authority to conduct board meetings.

       Thank you.

       Sincerely yours,

Ray Beckerman

3.  Regular general assemblies shall be held within the first quarter of each odd-numbered year.

4.  If a general assembly for purposes other than impeaching the president cannot be held due to lack of quorum or other reasons, a second general assembly must be reconvened within 20 days from the date of the failed assembly. If the second general assembly also fails, the Board of Directors may resolve the matters submitted.

5.  If a general assembly for impeaching the president cannot be held due to lack of quorum or other reasons, a second general assembly must be reconvened within 7 days from the date of the failed assembly. If the second general assembly also fails, within 7 days after the failure of the second assembly, the Council of Past Presidents and the Board of Directors shall jointly convene a meeting to decide on the impeachment of the president with a two-thirds majority vote.

**Article 5: Resolutions**

The decisions and responsibilities of the general assembly are as follows:

1.  Approval of all amendments to the bylaws.

2.  Approval of development, construction, reconstruction, loans secured by real estate, acquisition and sale of all real estate owned by KAAGNY, and approval of long-term leases of 10 years or more for all or part of the real estate owned by KAAGNY.

3.  Approval of a single presidential candidate who has been formally registered in the election cycle when there is only one candidate for president.

4.  Deliberation and decision on matters submitted by the president, the Board of Directors, or 150 or more members of the Association submitted in writing to the chairperson of the general assembly.

5.  All votes shall be conducted by secret ballot, and KAAGNY shall retain voting records for a minimum of 7 years.

# CHAPTER 5: BOARD OF DIRECTORS

**Article 1: Board of Directors**

The Board of Directors is the highest deliberative and decision-making body of KAAGNY and has decision-making authority over all matters, including regular and ad-hoc meetings of the Board.

**Article 2: Composition**

The Board of Directors consists of a minimum of twenty-one and a maximum of ninety-nine directors. The Nominating Committee recommends organizational and individual directors, who are then approved by a majority vote of the Board of Directors.

**Article 3: Qualifications**

The Board of Directors determines the qualifications of its members.

## Article 4: Executive Officers of the Board

The Board of Directors is composed of executive officers such as the Chairperson, Vice-Chairman, Secretary, Assistant Secretary, and Treasurer, with the following responsibilities and duties:

1. Chairperson (or Chairwoman): Convenes Board meetings, presides over meetings, and oversees the overall operations of the Board.

2. Vice-Chairman (or Vice-Chairwoman): Assists the Chairperson and assumes all duties and responsibilities of the Chairperson in the absence or incapacity of the Chairperson.

3. Secretary: Maintains records of all Board meetings, including minutes.

4. Assistant Secretary: Assists the Secretary and assumes all duties and responsibilities of the Secretary in the absence or incapacity of the Secretary.

5. Treasurer: Responsible for the finances of KAAGNY, including accepting and depositing funds, maintaining financial transaction records, providing financial statements upon request, submitting an annual financial report to the Board by April 30th each year, and performing other duties specified by the Board or these bylaws. Also proposes an annual budget to the Board before the start of each fiscal year.

## Article 5: Election and Term of the Board of Directors

1. Election of Board Executives: Board executives are elected as follows:

   a. Chairperson: Must be recommended by the Board and approved by a majority vote of the Board attending the first meeting of the Board's new term.

   b. Vice-Chairman: Must be recommended by the Board and approved by a majority vote of the Board attending the first meeting of the Board's new term.

   c. Secretary: Must be recommended by the Board and approved by a majority vote of the Board attending the first meeting of the Board's new term.

   d. Assistant Secretary: Must be recommended by the Board and approved by a majority vote of the Board attending the first meeting of the Board's new term.

   e. Treasurer: Must be recommended by the Board and approved by a majority vote of the Board attending the first meeting of the Board's new term.

2. Term

   a. The term of office for all executives, including the Chairperson, is two years and may be re-elected for up to three consecutive terms, totaling six years.

   b. Re-election is determined by a majority vote of the Board with a majority attendance.

   c. After three consecutive terms, reappointment may be made after one year.

3. Replacement of Board Members

In the event of resignation, death, or inability to perform duties for any reason, the Vice-Chairman replaces the Chairperson for the remaining term. For all other executives except the Chairperson, the replacement for the remainder of the term shall be appointed by the Chairperson.

## Article 6: Committees

The Board of Directors may establish committees as deemed necessary, including but not limited to the following committees:

1. Building Management Committee: Responsible for the management of the KAAGNY building.

2. Museum of Korean American Heritage Committee: Responsible for the operation of the museum.

3. Nominating Committee: Promotes and receives nominations for new directors, gathers personal information, and presents interview summaries to the Board.

4. Finance Committee: Reviews strategies and expenditures for the financial security of KAAGNY.

5. Program Committee: Establishes and supports various programs of KAAGNY.

6. Audit Committee: Participates in internal and external audits of the association. The Chairperson of the committee oversees the audit process.

7. Special Committees: Establishes special committees as needed.

According to New York State law, all members of committees under the Board of Directors are to be composed of directors of the Board. However, the Building Management Committee and Special Committees may recruit external experts.

## Article 7: Convocation and Notice of Board Meetings

Regular Board meetings are held six times per year. Special Board meetings may be convened upon the request of the President, Chairperson, or six or more directors of the Board. Notice of Board meetings must be provided to all directors of the Board via mail, email, or telephone at least seven days before the meeting, including the agenda items.

## Article 8: Quorum of the Board of Directors

The quorum for Board meetings is determined as follows:

1. The quorum for Board meetings is met by the presence of a majority of attending directors. The Board may resolve matters with the approval of a majority of attending directors, except in cases of impeachment or as specified in Article 8, Section 2 below.

2. The quorum for the following matters specified in a-d below requires the presence of at least two-thirds of attending directors. The Board may make decisions with the approval of more than two-thirds of attending directors:

a. Development, construction, redevelopment, acquisition, or sale of real estate owned or leased by KAAGNY.

EXHIBIT B

김동민 변호사를 뉴욕,뉴저지 법원에 아래의 사유들로 신고했슴을 알립니다.

1.한인회 5층 테넌트가 소송을 하지 않았음을 알고도, 한인사회에 소송을 제기하였다고 거짓 정보를 생산 유통하면서 한인들의 도네이션을 받으려한 점.

2.뉴욕 한인회 자문 변호사로서 원활한 이사회를 조력해야 함에도, 스스로 이사회 이사라고 주장하며 이사회 진행을 노골적으로 방해하고 결국 파행에 이르게 한 적극적 주동자.

3.한인회와 이사회의 법적 조력을 해야 함에도 이명석 회장 개인 변호사로 정관을 왜곡하고 합법적 이사장을 무력화시키려고 주동한 장본인.명백한 이해상충임.

4.가짜 이사회를 만드는 불법을 주도함.

5.이명석 회장의 불법을 외면 묵인 조력하며, 한인회에 손해를끼치고 위험에 빠뜨린 점.


I am informing you that I have filed a complaint against attorney Kim Dong-min [Daniel] with the New York and New Jersey Bar Associations for the following reasons:

1. Despite knowing that the tenant on the 5th floor of the Korean Association building had not filed a lawsuit, he produced and disseminated false information to the Korean community, claiming that a lawsuit had been filed, in an attempt to solicit donations from Korean community members.

2. As an advisory attorney for the New York Korean Association, he was supposed to assist in the smooth operation of the board of directors, but instead, he actively disrupted the board meetings, claiming to be a board member himself, ultimately causing the meetings to fail.

3. Despite being obligated to provide legal assistance to the Korean Association and its board of directors, he distorted the articles of association and spearheaded efforts to undermine the legitimate chairman, acting as President Lee Myung-seok's personal lawyer. This is a clear conflict of interest.

4. He spearheaded the illegal creation of a fake board of directors.

5. He ignored, condoned, and assisted in President Lee Myung-seok's illegal activities, causing harm to the Korean Association and putting it at risk.